United States District Court
Southern District of Texas
**ENTERED**
August 26, 2024
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| MUHAMED PATHE BAH, | § | |
| Movant, | § | |
| | § | |
| v. | § | Civil Action No. 1:23-cv-166 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

**MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

Muhamed Pathe Bah moves under 28 U.S.C. § 2255 to vacate, set aside, or correct his federal sentence, arguing in three claims that he received ineffective assistance of counsel at trial. Dkt. Nos. 1, 3 (collectively, Bah's "Motion"). The United States of America ("the Government") responded and moved for summary judgment, asserting that Bah has failed to meet his burden to prove ineffective assistance of counsel. Dkt. No. 16.[1] For the reasons provided below, the undersigned recommends that the Court: (1) **GRANT** the Government's Motion for Summary Judgment on Bah's first and second claims; (2) **DISMISS** all three of Bah's claims; (3) **DECLINE** to issue a certificate of appealability; and (4) **DIRECT** the Clerk of Court to close this case.

## I.    JURISDICTION

The Court has federal question subject matter jurisdiction. *See* 28 U.S.C. §§ 1331, 2255.

---

[1] The Court references the docket in this § 2255 action using the "Dkt." designation. The Court references the docket in Bah's underlying criminal cause, No. 1:20-cr-00433-1, using the "CR Dkt." designation.

## II.    BACKGROUND & PROCEDURAL HISTORY

On June 26, 2020, Bah robbed the Texas Regional Bank in Harlingen, Texas. Dkt. No. 4 at 8. During the robbery, Bah fired one shot, which hit a bank teller in the head—the teller fell to the ground bleeding, felt a burning sensation, and temporarily lost his hearing.[2] *Id.* at 8–9, 12. Bah then aimed his gun at a second teller and demanded money; the second teller obliged, filling Bah's backpack with greenbacks.[3] *Id.* at 9–10. Bah fled on his bicycle only to be apprehended by police soon after. *Id.* at 9. Police found on Bah a ten-shot, .22 caliber revolver and a backpack containing stacks of currency totaling $16,500. *Id.* at 9, 11. They retrieved surveillance footage from the bank showing the robbery. *Id.* at 9.

Police transported Bah to the police station where they tested his hands for gunshot residue, got a positive result, and discovered nine rounds and one spent bullet casing loaded in Bah's revolver. *Id.* at 10–11. The police read Bah his *Miranda* rights, and Bah admitted that he entered the bank with the gun but did not remember firing it. *Id.* at 11.

On July 21, 2020, a grand jury indicted Bah on one count of robbery in violation of 18 U.S.C. § 2113(a) and (d) ("Count One") and one count of use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii) ("Count Two"). Dkt. No. 3 at 97. In October 2020, at Bah's initial appearance, the Court appointed the Federal Public Defender to represent Bah. CR Dkt. (October 5, 2020 Minute Entry). At his arraignment in November 2020, Bah informed the Court that he desired to proceed pro se. CR Dkt.

---

[2] The teller was taken to the hospital for various tests and treatments, ultimately receiving over a dozen staples in his scalp. CR Dkt. No. 63 at 2.

[3] As a result of the robbery, the second teller spent a day in the hospital, noting that she could not breathe, she felt her heart beating very fast, and she thought she would pass out or suffer a heart attack. *Id.* at 14.

(November 2, 2020 Minute Entry). The Court warned Bah that proceeding pro se is inadvisable and then discharged the Federal Public Defender from the case. *Id.* At a final pretrial conference on December 2, 2020, Bah confirmed his desire to proceed pro se and announced ready for trial. CR Dkt. No. 77 at 5. The Government expressed concern over Bah's proceeding pro se given, among other things, his prior schizophrenia diagnosis. *Id.* at 5–7. It urged that "given the seriousness and potential punishment range for this case," and because "Bah indicated that he had been diagnosed with schizophrenia at one point," which "may be something that could feed into [his] election [to proceed pro se] . . . it would behoove us all" to have an attorney interview Bah to ensure his desire to proceed pro se. *Id.* at 7, 14. The Court warned Bah a second time about proceeding pro se and appointed a Criminal Justice Act Panel attorney ("Counsel") as standby trial counsel to assist Bah.[4] *Id.* at 7–8, 15–16.

On December 4, 2020, though ostensibly still on standby status, Counsel moved to evaluate Bah's competency, informing the Court in part that:

> During the attorney-client interview, [Bah] appeared to have a psychological illness and it appears to [C]ounsel that [Bah] may presently be suffering from a mental disease or defect to the extent that he is unable to understand the nature and the consequences of the proceedings against him or properly assist in his defense . . . [and] is unable to understand the nature and the consequences of his conduct with respect to the charges filed against him.

CR Dkt. No. 25 at 1. The Court granted the motion (CR Dkt. No. 29), and psychiatrist Dr. Tomas A. Gonzalez examined Bah and submitted a report containing his findings (CR Dkt. No. 33).

---

[4] As described in more detail below, throughout this case, Counsel shifted on Bah's request from standby status to counsel of record then back to standby status and then to counsel of record once more. The undersigned refers to Bah's trial counsel as "Counsel" throughout this Report and Recommendation irrespective of Counsel's status at any one point.

Among other things, Dr. Gonzalez's report describes the "current status" of Bah's mental health, Bah's "past medical history," and Bah's "legal history." CR Dkt. No. 33 at 2–3. The report lists that: (1) Bah's family committed him to certain psychiatric hospitals eight times from 2012 through 2019; (2) Bah received medication for his mental health; (3) Police arrested Bah in 2016 for assaulting a government official; and (4) Bah claims he is schizophrenic, but he was not presenting signs or symptoms of schizophrenia during the exam. *Id.* at 3–4. Based on his examination, Dr. Gonzalez concluded that Bah was competent to stand trial and assist in his defense. *Id.*

At a status conference in March 2021, Bah indicated that he no longer desired to proceed pro se, and the Court designated Counsel as Bah's counsel of record. CR Dkt. (March 24, 2021 Minute Entry). In April 2021, Bah once again desired to proceed pro se. CR Dkt. (April 21, 2021 Minute Entry); Dkt. No. 16-1 at 3. The Court again designated Counsel as standby counsel and set the trial date for June 28, 2021. CR Dkt. (April 21, 2021 Minute Entry); Dkt. No. 16-1 at 3. On June 25, 2021, Bah changed his mind once more and requested that Counsel be reappointed counsel of record, and the Court granted that request. Dkt. Nos. 3 at 79–80, 16-1 at 3–4.

On June 28, 2021, Bah entered an open plea of guilty on both counts alleged in the indictment, which the Court accepted. Dkt. No. 3 at 89. The Court ordered a presentence investigation report ("PSR") and scheduled sentencing for September 22, 2021. *Id.* at 92–93. The United States Probation Office filed the PSR on September 21, 2021. Dkt. No. 4 at 6. The PSR summarized the facts of the case, including that Bah had been diagnosed as schizophrenic and committed for treatment; described the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") offense level computation; and concluded that the guidelines range for Count One was fifty-one to sixty-three months' imprisonment,

and the mandatory minimum term on Count Two was a consecutive, ten-year term of imprisonment. Dkt. No. 4 at 20—21. Further, the PSR stated that the statutory maximum punishment on Count One was twenty-five years' imprisonment, and life imprisonment on Count Two. *Id.*

On September 22, 2021, the Court held Bah's sentencing hearing. CR Dkt. No. 80. Neither party objected to the PSR. *Id.* at 2–3. The Government sought consecutive punishment in the form of twenty-five years' (300 months') incarceration on both counts, constituting an upward departure or variance from the Guidelines range of a combined 171–183 months. *Id.* at 6–9. Ultimately, the Court sentenced Bah to twenty-five years' incarceration on Count One and life imprisonment on Count Two—both the statutory maximums. *Id.* at 24–25. Bah appealed his sentence, challenging the Court's upward variances on both counts; the Fifth Circuit affirmed Bah's sentence as to both counts. *United States v. Bah*, No. 21-40712, 2023 WL 2239021, at *4 (5th Cir. Feb. 24, 2023) (per curiam).

On November 13, 2023, Bah filed his instant Motion arguing that he received ineffective assistance of counsel during sentencing when Counsel failed: (1) "to present mitigating evidence to explain Bah's history of mental illness and schizophrenia diagnosis"; (2) "to object to make fundamental objections to . . . Bah's case"; and (3) "to present all formal plea offers by the United States to . . . Bah" when "there [was] a reasonable probability [Bah] would have accepted an earlier plea offer had he been afforded effective assistance of counsel." Dkt. No. 3 at 2–3. Bah advances multiple arguments within each of the three listed grounds for ineffective assistance of counsel. For clarity, the Court will list additional facts pertinent to its analysis when addressing each issue below.

On January 25, 2024, the Government responded to Bah's Motion and moved for summary judgment. Dkt. No. 16. Bah replied on February 13, 2024. Dkt. No. 22. The Government filed its surreply on February 29, 2024. Dkt. No. 24. And Bah filed his sur-surreply on March 6, 2024. Dkt. No. 28. On August 2, 2024, the Court held an evidentiary hearing limited to Bah's third issue concerning plea offers. Dkt. (August 2, 2024 Minute Entry). Bah's Motion is now ripe for consideration.

### III.    LEGAL STANDARD

#### A.    28 U.S.C. § 2255

Postconviction relief under 28 U.S.C. § 2255 is limited to errors of constitutional dimension that could not have been raised on direct appeal and that, if left unaddressed, would result in a complete miscarriage of justice. *See United States v. Cervantes*, 132 F.3d 1106, 1109 (5th Cir. 1998); *see also United States v. Rodriguez-Castro*, 814 F. App'x 835, 837-38 (5th Cir. 2020) (per curiam). Given these limitations, a federal defendant may move to vacate, set aside, or correct his sentence under § 2255 only if: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court lacked jurisdiction to impose the sentence; (3) the sentence imposed exceeds the statutory maximum; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996).

#### B.    Summary Judgment Standard

The standard applied when ruling on a motion for summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 56(a). In pertinent part, Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same). When considering a motion for summary judgment, the court must view the evidence and "construe all facts and inferences in the light most favorable to the nonmoving party." *Valderas v. City of Lubbock*, 937 F.3d 384, 388 (5th Cir. 2019) (per curiam). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine [dispute] of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007). "A fact is material if its resolution could affect the outcome of the action." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (cleaned up). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (per curiam) (cleaned up). In the context of habeas petitions, the Federal Rules of Civil Procedure apply to the extent that they do not conflict with the Rules Governing § 2255 Proceedings. Rule 12, Rules Governing § 2255 Proceedings; *see also* Fed. R. Civ. P. 81(a)(4).

## C. Ineffective Assistance of Counsel

The "Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings" instituted against him. *Missouri v. Frye*, 566 U.S. 134, 140 (2012) (citing *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009)). Critical stages include trial and pretrial proceedings—including the plea-bargaining process. *Laffler v. Cooper*, 566 U.S. 156, 168 (2012). Even though sentencing does not concern the defendant's guilt or innocence, ineffective assistance of counsel during a sentencing hearing is also constitutionally impermissible. *Id.* at 164–65.

Whether a criminal defendant has been denied effective assistance of counsel is governed by *Strickland v. Washington*'s two-part inquiry:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. 668, 687 (1984). To demonstrate that an attorney's performance was constitutionally deficient, a defendant bears the burden to prove that his counsel's representation "fell below an objective standard of reasonableness." *Id.* at 687–88. In reviewing counsel's performance, the Court must be "highly deferential," making every effort "to eliminate the distorting effects of hindsight," and must "indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id.* at 689. To establish prejudice, the convicted defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.*

### IV.    ANALYSIS

Bah contends that Counsel provided ineffective assistance of counsel during sentencing for three reasons. Dkt. No. 3 at 2–3. The Court addresses each contention in turn.

### (1)    Failure to Present Mitigation Evidence

The bulk of the parties' briefing addresses Bah's first claim, in which he asserts that his "[t]rial counsel was constitutionally ineffective for failing to present mitigating

evidence to explain Bah's history of mental illness and schizophrenia diagnosis." Dkt. No. 3 at 12. Counsel "failed him," Bah continues, "by not presenting all arguments or evidence to help in reaching a fair and just sentence, not gathering and submitting as much mitigating information relevant to sentencing as reasonabl[y] possible, and by not independently investigating the facts relevant to sentencing and simply relying on the presentence investigation report ('PSR')." *Id.* at 13. Bah claims that the PSR merely "touched on [his] history of mental disorders," including a diagnosis for "minor schizophrenia" and inpatient treatment for psychosis episodes, when, in fact, there were considerable other mental health-related narratives that should have been raised. *Id.* at 13–14.

Bah provides affidavits in support of his Motion from his three siblings and his mother, who live in North Carolina, cataloguing his mental health history. *Id.* at 154–57, 313–24. Each relative testified that Bah's behavior changed at around age seventeen from a happy, active, and hygienic kid who was a good student and enjoyed school, to a kid who dropped out of school, stopped brushing his teeth, shaved his head, stayed in his room with the lights off, and laughed and talked to himself. *See generally id.* at 154–57, 313–24. His family members aver that they moved on multiple occasions to involuntarily commit Bah to a behavioral health facility, and that a judge signed orders of involuntary commitment. *See generally id.* at 154–57, 313–24. They state that Bah was diagnosed with schizophrenia and began receiving medication in the form of a pill and a monthly injection. *Id.* at 318. His family contends that with medication, Bah began acting like himself again. *Id.* He eventually switched from inpatient to outpatient care. *Id.* at 156. In 2020, the facility at which Bah received treatment closed due to COVID-19, purportedly

leaving Bah without the ability to refill his prescription or receive his monthly shots. *Id.* Consequently, Bah's mental health deteriorated. *Id.*

At some point in early 2020, Bah learned that Harlingen has a "low cost of living." *Id.* Within two days of that discovery, he drove to Harlingen from his home in North Carolina. *Id.* About two days after that, Bah "became unreachable." *Id.* On June 22, 2020, Bah's sister called the Harlingen police department to request a welfare check of her brother. *Id.* at 318–19. When authorities arrived at his rental house, Bah was nowhere to be found. *Id.* Four days later, Bah walked into the Texas Regional Bank, shot a teller, and made off with $16,500. *Id.* at 319.

Bah's family members assert that they reached out to Counsel to be involved in Bah's case and to request notice of Bah's sentencing date. Dkt. No. 3 at 319. However, according to the family, when they called Counsel, he "was uninterested in speaking with" them and "told [them] to never call him again." *Id.* at 323. Each family member affirmed that they were available and would have testified for Bah at his sentencing hearing on June 28, 2021. *Id.* at 157, 315, 319, 323.

Bah also provides the Court with "seven years' worth of involuntary commitment and mental health records," from September 2012 through July 2019, from "the North Carolina Court system." Dkt. No. 3 at 27–35, 159–252. Among other facts, the records show that:

> ➢ In September 2012, Bah's family brought him to the hospital because he was talking about messages from the TV, he exhibited aggressive behavior toward his siblings, and he withdrew "from all friends/activities." *Id.* at 172. Bah also scratched his mother on the way to the emergency room. *Id.* A doctor deemed Bah mentally ill and a danger to himself or others. *Id.* The Doctor also noted that Bah was hallucinating and acted aggressively toward his family. *Id.* Bah was committed for thirty days. *Id.*

> ➢ In January 2013, a doctor at the behavioral health center determined that Bah appeared paranoid and recommended inpatient commitment for fourteen days to prevent harm to Bah and others. *Id.* at 184–88. Doctors believed that Bah was exhibiting signs of schizophrenia. *Id.* at 184–85. A North Carolina court determined that Bah should be committed to a mental health hospital. *Id.* at 190.

> ➢ In May 2016, Bah was again involuntarily committed after the North Carolina state court found him to be "mentally ill and dangerous to self or others or mentally ill and in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness." *Id.* at 198. The commitment stemmed from a few incidents during which Bah became aggressive toward his family members, threatened his family members, ransacked his bedroom, punched a hole in the wall, did not talk to anybody for days, and shaved his head until it started bleeding. *Id.* at 200.

> ➢ In March 2019, Bah was again committed to a mental health facility after his family found him aimlessly wandering the streets, covered in gasoline, and carrying a gasoline canister. *Id.* at 240. The commitment order states that he held a schizophrenia diagnosis. *Id.* Bah's family provides a video clip of the incident. *Id.* at 273.

Bah contends that Counsel's failure to present the mitigating evidence resulted in a sentence that "unreasonably fails to reflect the statutory sentencing factors in 18 U.S.C. § 3553(a)." *Id.* at 36; *see* 28 U.S.C. § 3553(a) ("Factors to be considered in imposing a sentence.").

The Government responds, arguing that Bah's ineffective assistance for failure to provide mitigating evidence claim is meritless because: (1) "Bah instructed [Counsel] not to contact his family, precluding [Counsel] from developing additional mitigation evidence"; and (2) the district court "was aware of Bah's mental health issues and history" when it sentenced Bah. Dkt. No. 16 at 60. As to its first assertion, the Government provides an affidavit from Counsel stating in relevant part:

> I met with Mr. Bah on August 17, 2021, . . . [and] I asked Mr. Bah to allow me to speak to his mom or sister, so that I could get letters in support of him at sentencing and to give me support statements or documents as to any mental issues that he had in the past. He refused to give me permission to contact them. In fact, under oath, I asked Mr. Bah on numerous occasions

> to give me permission to speak to his family to help me develop mitigations and to ask them to appear as character witnesses in person or at least send me letters of support, and he refused to give me permission each and every time.

Dkt. No. 16-1 at 4. The Government also notes that Bah "limited the degree to which [Counsel] could address his mental health issues, and refused to either apologize to the victims or allow [Counsel] to apologize on his behalf." Dkt. No. 16 at 28, 61–62. As to its second assertion, the Government contends that even if Counsel provided deficient performance, Bah cannot prove that he was prejudiced because the Court was sufficiently informed of Bah's mental health history through Bah's mental health evaluation, the PSR, Counsel's arguments at sentencing, and the Court's own observations. *Id.* at 62–63.

In his reply to the Government's response, Bah clarifies that his first argument centers not solely on Counsel's failure to *present* mitigation evidence, but also his failure to reasonably *investigate* for any such evidence. Dkt. No. 22. Bah contends that Fifth Circuit precedent holds that an attorney has a duty to investigate for mitigation evidence even if the defendant refuses to consent to the investigation. *Id.* at 7 (citing *Sonnier v. Quarterman*, 476 F.3d 349, 358 (5th Cir. 2007)).

The Government argues in its surreply first that Bah improperly relies on "capital murder death sentences cases to support his claim that counsel was ineffective" for allegedly failing to investigate for and present mitigation evidence and, in any event, even under the capital murder standard, Bah's claim fails. Dkt. No. 24 at 2, 9–10. The Government claims there is no constitutional duty to present mitigation evidence in non-capital cases. *Id.* at 8–9. The Government then contends that under Supreme Court and Fifth Circuit precedent, a defendant's instruction not to present mitigation evidence forecloses an ineffective assistance claim for failing to investigate for mitigation evidence.

*Id.* at 13–15 (first citing *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007); and then citing *Balentine v. Lumpkin*, No. 18-70035, 2021 WL 3376528, at *7 (5th Cir. Aug. 3, 2021) (per curiam)). And the Government asserts that Bah's argument "comes down to a matter of degrees." *Id.* at 17. That is, Bah's habeas evidence merely "provide additional details on Bah's childhood and mental health episodes," and "[n]one of the evidence establishes any additional substantive issues that th[e] Court was not already aware of at sentencing—namely that Bah had a mental health history with a diagnosis of schizophrenia." *Id.*

Finally, Bah responds in his sur-surreply, arguing among other things that "[w]hile there may not be a constitutional requirement that mitigating evidence be <u>presented</u> in a non-capital case, there is a constitutional right to effective assistance of counsel, and for counsel to deliver effective assistance, counsel has a duty to <u>investigate</u>." Dkt. No. 28 at 5. Bah also takes issue with the Government's "matter of degrees" argument because, per Bah, Counsel conducted no investigation at all. *Id.* at 9–10.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The Supreme Court "has explicitly rejected a 'constitutional duty to investigate' applicable to all cases, instead emphasizing that the 'constitutionally protected independence of counsel' precludes the establishment of a 'particular set of detailed rules' or even 'specific guidelines' beyond reasonableness." *Clark v. Thaler*, 673 F.3d 410, 419 (5th Cir. 2012) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 194–95 (2011)). Accordingly, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Courts must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time

of counsel's conduct." *Id.* The Supreme Court "long ha[s] recognized that '[p]revailing norms of practice as reflected in American Bar Association standards . . . are guides to determining what is reasonable[.]'" *United States v. Juarez*, 672 F.3d 381, 388 (5th Cir. 2012) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010)). However, the American Bar Association ("ABA") standards are "only guides, and not inexorable commands." *Padilla*, 559 U.S. at 367 (cleaned up). While the "standards may be valuable measures of the prevailing professional norms of effective representation," *id.*, the ultimate test remains one of reasonableness under the circumstances, *Strickland*, 466 U.S. at 689–90; *see Clark*, 673 F.3d at 419.

On that note, Bah relies on *Sonnier v. Quarterman*, 476 F.3d 349 (5th Cir. 2007), for the proposition that "a defendant's refusal to consent to counsel undertaking more extensive and in-depth discussions with the defendant's family and acquaintances to determine the nature and extent of the mitigation evidence available is <u>not</u> a reasonable grounds for their failure to do so." Dkt. No. 22 at 7 (cleaned up). *Sonnier* stemmed from a death row inmate's 28 U.S.C. § 2254 petition. *Sonnier*, 476 F.3d at 354. In that case, at sentencing, "Sonnier's attorneys, pursuant to [Sonnier's] wishes and instructions, did not present any mitigation evidence. Sonnier, on the record, confirmed that he had consistently instructed his attorneys not to present any mitigation evidence." *Id.* at 355. The Texas state court sentenced Sonnier to death. *Id.* Sonnier later filed his federal habeas petition, which was denied along with his request for a certificate of appealability ("COA"). *Id.* Sonnier then requested a COA from the Fifth Circuit contending, among other things, that his trial counsel was ineffective for failing to investigate and present mitigation evidence at the punishment phase of his trial. *Id.*

Addressing the deficient performance *Strickland* prong, the Fifth Circuit explained that in *Strickland*, the Supreme Court "rel[ied] upon the guideposts of the ABA's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, [when] not[ing] that counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 357–58 (citing *Strickland*, 466 U.S. at 691). At the time, the version of ABA standards for death penalty cases in place provided that "investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." *Id.* at 358 n.3 (quoting ABA, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* § 11.4.1c (1989)). So, the Fifth Circuit, "[a]pplying that standard*," concluded "that the trial attorneys stopped short of making a reasonable investigation," and that "Sonnier's refusal to consent to their undertaking more extensive and in-depth discussions with his family and acquaintances to determine the nature and extent of the mitigation evidence available was not reasonable grounds for their failure to do so." *Id.* at 358 (emphasis added).[5]

That standard does not apply in the non-death penalty context within the "criminal justice standards for the defense function" cited by Bah here—indeed, they specify that "the death penalty differs from other criminal penalties" and informs counsel in capital cases to reference the applicable death penalty standards. *See* ABA, *Criminal Justice Standards for the Defense Function*, § 4-1.2(g) (4th ed. 2017) ("Because the death penalty differs from other criminal penalties, defense counsel in a capital case should make

---

[5] The Fifth Circuit concluded, however, that Sonnier could not meet his burden to prove the prejudice prong of *Strickland*, so it denied his request for a certificate of appealability. *Sonnier v. Quarterman*, 476 F.3d 349, 358–59 (5th Cir. 2007).

extraordinary efforts on behalf of the accused and, more specifically, review and comply with the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases."). Instead, in non-capital offenses, counsel maintains a "duty to investigate in all cases, and to determine whether there is a sufficient factual basis for criminal charges." *Id.* § 4-4.1(a). The standard also provides that "[t]he duty to investigate is not terminated by factors such as the apparent force of the prosecution's evidence, a client's alleged admissions to others of facts suggesting guilt, a client's expressed desire to plead guilty or that there should be no investigation, or statements to defense counsel supporting guilt." *Id.* § 4-4.1(b). Unlike in the death penalty context, the standard does not specify its applicability or necessity in the sentencing phase of trial and for mitigation purposes. *Id.* And as applicable here, that standard also does not provide that an attorney must disregard a defendant's instructions not to contact specific witnesses, like one's parents and siblings. *Id.*; *see also Neiheisel v. United States*, No. 3:17-CR-89-BJD-JBT, 2022 WL 17534123, at *8 (M.D. Fla. Sept. 27, 2022) ("Nor do the ABA standards provide, as Lamos suggested, that an attorney <u>must</u> disregard a client's directive not to contact a <u>specific</u> witness even when the client has not suggested that the witness would be helpful."), *adopted by*, No. 3:17-CR-089-BJD-JBT, 2022 WL 16833629 (M.D. Fla. Nov. 9, 2022); *cf. Richmond v. United States*, No. 4:15CR00028-001, 2019 WL 1499160, at *5 (E.D. Tex. Apr. 5, 2019) (suggesting that the reasonableness standard applied to counsel's failure to investigate and present mitigation evidence in the death penalty context differs from the standard "in the context of a non-capital case after a plea of guilty pursuant to a plea agreement"). For these reasons, to the extent it bears on the reasonableness of

Counsel's performance, the ABA standards Bah cites and *Sonnier* provide little guidance here.[6]

The Government cites *Schriro v. Landrigan*, 550 U.S. 465 (2007), *Balentine*, 2021 WL 3376528, at *7, *Shore v. Stephens*, No. CV H-13-1898, 2016 WL 687563, at *11 (S.D. Tex. Feb. 19, 2016), *Ramirez v. Davis*, 780 F. App'x 110, 119–20 (5th Cir. 2019), and *Villanueva v. Stephens*, 619 F. App'x 269, 273–74 (5th Cir 2015) (per curiam), for the proposition that "a defendant who refuse[s] to allow the presentation of any mitigation evidence could not establish *Strickland* prejudice based on his counsel's failure to *investigate* further possible mitigating evidence," because "a competent defendant's instructions are entitled to be followed by counsel" as the defendant is the "master of his own defense." Dkt. No. 24 at 13, 13–15. While an accurate recitation of the stated rule, here, according to the evidence in the record, Bah did not disallow the investigation or presentation of *any* mitigation evidence, but only Counsel's investigation and presentation of testimony from his family and Bah's medical records. *See* Dkt. Nos. 16 at 28, 61–62; 16-1 at 4. Nevertheless, family testimony and medical records are the two focuses of Bah's briefing, so the undersigned only addresses the same.

In his affidavit, Counsel states that he asked Bah for permission to speak to Bah's mother or sister to obtain "support statements or documents as to any mental issues that he had in the past" for use at sentencing, but Bah refused. Dkt. No. 16-1 at 4. After Bah's sentencing, Counsel asked Bah to answer some questions on the record:

> [Counsel]    Now I . . . just want to ask you on the record, sir, prior to today, I . . . did go visit you at the jail on several occasions and I asked you to give me permission to reach out to your family

---

[6] Bah also cites *Soffar v. Dretke*, 368 F.3d 441, 477 (5th Cir. 2004), and *Escamilla v. Stephens*, 749 F.3d 380, 392 (5th Cir. 2014), for support. These cases, too, are distinguishable. *See Soffar*, 368 F.3d at 477 (death penalty case where counsel's inadequate investigation was not due to defendant's instructions not to investigate); *Escamilla*, 749 F.3d at 392 (death penalty case relying on *Sonnier*).

> so they could maybe write a letter of reference or something on your behalf; is that correct?
>
> [Bah]          Yeah.
>
> [Counsel]     And you said, no. You did not allow me to do that correct?
>
> [Bah]          That's true.

Dkt. No. 3 at 82. Bah does not dispute that he informed Counsel not to contact his family for records or testimony. This evidence precludes a deficiency finding regarding Counsel's alleged failure to interview and collect medical records from Bah's family members. After being found competent to assist in his defense, Bah directed Counsel not to interview or collect records from his family members, and Counsel complied. Bah cannot now fault Counsel for following his directions. *See Shore v. Davis*, 845 F.3d 627, 633 (5th Cir. 2017) (per curiam) ("A defendant cannot raise a *Strickland* claim based on counsel's compliance with his instructions."); *Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004) ("[W]hen a defendant blocks his attorney's efforts to defend him, including forbidding his attorney from interviewing his family members for purposes of soliciting their testimony as mitigating evidence during the punishment phase of the trial, he cannot later claim ineffective assistance of counsel."); *cf. Mullis v. Lumpkin*, 70 F.4th 906, 914 (5th Cir. 2023) (stating that counsel's request for a mental health evaluation constituted a form of investigation).

Finding that Counsel did not provide deficient performance, the Court need not assess Bah's assertion that his sentence would have been different had his family's testimony and his medical records been before the Court at sentencing. *See Strickland*, 466 U.S. at 694; *Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995) ("In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland*

standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test."); *see also Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994) ("[I]n deciding ineffectiveness claims, we need not address both prongs of the *Strickland* test."). Nevertheless, even assuming without finding that Counsel was deficient, the Court finds that Bah cannot prove that he was prejudiced. *See Strickland*, 466 U.S. at 694. To establish prejudice, Bah must prove that but for his family members' testimony and the health records, the Court would have imposed a shorter sentence. *See id.* at 687, 694.

As stated above, concerned with Bah's mental health, Counsel requested a psychiatric evaluation, which the Court ordered. CR Dkt. Nos. 25, 29. Dr. Gonzalez then interviewed Bah, chronicled his mental health history, and subjected him to certain forensic tests. CR Dkt. No. 33. Dr. Gonzalez learned that Bah's family had him involuntarily committed eight times from 2012 through 2019, and that Bah carried a schizophrenia diagnosis. *Id.* at 2. Dr. Gonzalez concluded that Bah showed no current signs or symptoms of schizophrenia, was competent to stand trial, and was capable of assisting in his defense. *Id.* at 3–4.

After being found competent to do so, Bah pleaded guilty to each count in his indictment. CR Dkt. (June 28, 2021 Minute Entry). The only issue that then remained was sentencing before the Court. Before sentencing, and in addition to Dr. Gonzalez's report, Counsel and the Court possessed the PSR, which included, among other things, information gleaned from interviews with Bah's mother and sister summarizing Bah's mental health history. Dkt. No. 4 at 18–20. The affidavits and medical records Bah presents here, while heavier on specific details of certain mental health episodes, contain the same basic information listed in the PSR—that Bah: (1) was diagnosed with schizophrenia; (2) received medical treatment in North Carolina; (3) suffered from

psychosis episodes and was involuntarily committed to a mental health facility multiple times from 2012 through 2019; (4) was medicated and began feeling better; (5) stopped taking his medication when released from his commitment and his mental health deteriorated; and (6) was in denial that he suffered from a mental condition. *Id.* The Court also possessed surveillance video of Bah's robbery showing Bah shooting the bank teller; victim impact statements detailing what the Fifth Circuit described as "the harrowing facts of the case"; and the Court observed Bah and listened to Bah's brief testimony throughout his various proceedings in which he asserted that he had been diagnosed with schizophrenia and refused to apologize to his victims. Dkt. No. 4; CR Dkt. Nos. 65, 80 at 11, 63–63-5; *Bah*, 2023 WL 2239021, at *4. With all that information in hand, the specific details of Bah's psychosis episodes—most occurring years earlier—were of limited additional value to present in mitigation. Thus, the undersigned does not find that their presentation to the Court at sentencing would have changed Bah's sentence. *See Strickland*, 466 U.S. at 694.

Bah has failed to meet his burden to prove that Counsel's performance was deficient or that he was prejudiced. *Id.* The undersigned recommends that the Court grant the Government summary judgment on Bah's claim of ineffective assistance of counsel for Counsel's alleged failure to investigate or present mitigation evidence.

**(2)    Failure to Make Certain Objections to the PSR**

By his second claim with five sub-claims, Bah argues that Counsel was ineffective for failing to make various objections to the PSR. Dkt. No. 3 at 40. Specifically, Bah argues that:

> There were at least five objections counsel could have made to the PSR, but which he did not make: (1) Counsel failed to object to a four-level increase for a victim sustaining "serious bodily injury," (2) Counsel failed to object

to the PSR's failure to comply with Rule 32 of the Federal Rules of Criminal Procedure, (3) Counsel failed to object to the PSR's finding that factors were present to support an upward departure, (4) Counsel advocated against Mr. Bah by taking an adverse position and recommending an upward departure/variance of at least five years, and (5) Counsel failed to dispute the United States's mischaracterization of Mr. Bah's only prior misdemeanor conviction as a "conviction of violence conviction" [sic]. (Exs. 4, 9). Had counsel made these objections, this Court could have subtracted two points off the offense level, reducing the Guideline range from fifty-one to sixty-three months to forty-one to fifty-one months for Count One. *See* U.S.S.G. §5A.

*Id.*[7] For various reasons considered below, the Government asserts that each of these five claims is meritless. Dkt. No. 16 at 42. The Court addresses the claims in turn.

(i)    Failure to object to enhancement for "serious bodily injury"

Bah asserts that Counsel was ineffective when he "failed to object to the absolute lack of evidentiary support necessary for the Court to make a finding that the offense caused 'serious bodily injury'" and "failed to object to the PSR's erroneous application of a four-level increase for serious bodily injury, which resulted in an improperly calculated offense level and Guideline range." Dkt. No. 3 at 41. According to Bah, the PSR exaggerated the teller's injury by repeated reference to his being "shot in the head" when there is no evidence that the bank teller's headwound was any more serious than a mere graze. *Id.* at 41–43.

The Government responds, arguing that Bah "minimizes the injury he inflicted by shooting the bank teller in the head and ignores the text of the guidelines." Dkt. No. 16 at 43. It highlights that the teller was treated at a hospital, underwent testing, and received "over a dozen staples in [his] scalp." *Id.* at 44; *see also* CR Dkt. No. 63 at 1–4 (the teller's victim impact statement). The Government asserts that courts "have affirmed the [serious

---

[7] In arguing the deficient performance prong of *Strickland* for the five sub-arguments of his second issue, Bah cites no case law to assist the Court in its analysis. *See* Dkt. No. 3 at 40–56.

bodily injury] enhancement as applied to lesser injuries than presented here" and "Counsel cannot be deficient for failing to press a frivolous point." Dkt. No. 16 at 44–45. Attached to its response is an affidavit by Counsel stating that objecting to the serious bodily injury designation here would have been frivolous and potentially violative of the Rules of Professional Conduct. Dkt. No. 16-1 at 4. The Government also highlights that claims raising Guidelines errors are not cognizable in § 2255 motions. Dkt. No. 16 at 42–43 n.12; *see United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999) ("Misapplications of the Sentencing Guidelines . . . are not cognizable in § 2255 motions."). The Government contends that Bah's PSR claims "are thinly veiled in . . . Bah's [Motion] and brief as ineffective assistance claims," purportedly as an attempt to skirt the former argument's restriction in this § 2255 action. Dkt. No. 16 at 42–43 n.12.

Section 2B3.1(b)(3)(B) of the Guidelines calls for a four-level sentence increase if the victim of a robbery sustained a "serious bodily injury." U.S.S.G. § 2B3.1(b)(3)(B). "Serious bodily injury" is defined in the Guidelines commentary as an "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." *Id.* § 1B1.1. cmt. n.(1)(M); *see also United States v. Nelson*, No. 22-12511, 2023 WL 5608430, at *3 (11th Cir. Aug. 30, 2023) (per curiam) (unpublished) ("[T]he Guidelines themselves do not define serious bodily injury."). Courts have found a wide spectrum of injuries to constitute serious bodily injuries. *See, e.g.*, *United States v. Lavert*, 830 F. App'x. 894, 895 (9th Cir. 2020) (concluding no error when district court held defendant caused serious bodily injury when he "struck the victim on the head with a gun, causing a laceration requiring nine

staples"); *United States v. Urbina-Robles*, 817 F.3d 838, 847 (1st Cir. 2016) (concluding the same regarding a lesion on one victim's head, multiple bruises on both victims' faces and heads, and necessary continued psychiatric care for trauma); *United States v. Clay*, 90 F. App'x. 931, 933 (6th Cir. 2004) (concluding the same when defendant pistol whipped the victim causing him to lose consciousness, bleed, and require sutures); *United States v. Reed*, 26 F.3d 523, 531 (5th Cir. 1994) (holding that post-traumatic stress disorder can constitute a "serious bodily injury"); *United States v. Moore*, 997 F.2d 30, 37 (5th Cir. 1993) (concluding no error when district court held defendant caused serious bodily injury where victim had extremely painful gunshot flesh wound in leg requiring a two-hour emergency room visit but no surgery).

Per the record, one bank teller "was shot at the top right side of [his] head."[8] CR Dkt. No. 63 at 2. He fell to the ground, was bleeding profusely, and temporarily lost his hearing. Dkt. No. 4 at 12.  He "was taken to Valley Baptist Medical Center and underwent a full body CT scan to ensure that there was not any bleeding in his head." CR Dkt. No. 63 at 2. He "was monitored for several hours and had [his] head wound cleaned and received over a dozen staples in [his] scalp." *Id.* The undersigned finds that these injuries would have supported a "serious bodily injury" designation and enhancement. *See, e.g.*, *Lavert*, 830 F. App'x. at 895; *Clay*, 90 F. App'x. at 933. Therefore, Counsel was not deficient for failing to object to the designation, and Bah was not prejudiced. *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim

---

[8] Notably, Bah agreed with the Government's factual summary of his offense stating, among other things, that he shot one teller "in the head" and "assaulted and put in jeopardy the life of a person by the use of a dangerous weapon, a firearm." Dkt. Nos. 3 at 91, 43-2; CR Dkt. No. 49.

because the result of the proceeding would not have been different had the attorney raised the issue."); *Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."); *see also Strickland*, 466 U.S. at 687. The undersigned recommends that the Court grant the Government summary judgment on this claim.

(ii)    Failure to object to the PSR's noncompliance with Rule 32 of the Federal Rules of Criminal Procedure

Federal Rule of Criminal Procedure 32(d) sets forth the requirements of a PSR. *See* Fed. R. Crim. P. 32. Among other things, the PSR must "identify any factor relevant to . . . the appropriate kind of sentence, or . . . the appropriate sentence within the applicable sentencing range," *id*. R. 31(d)(1)(D), and "any other information that the court requires, including information relevant to the factors under 18 U.S.C. § 3553(a)," *id*. R. 31(d)(2)(G); *see* 18 U.S.C. § 3553(a) ("Factors to be considered in imposing a sentence."). Bah asserts that "[i]nstead of presenting an objective review of all factors relevant to determining the sentence, the PSR injected its own subjective and unqualified medical opinions in alleging Mr. Bah caused 'serious bodily injury.'" Dkt. No. 3 at 44. He also alleges that the PSR lacks sufficient detail of his mental health history. *Id*. at 45. Given the Probation Officer's purported violation of Rule 32, Bah contends that Counsel was ineffective for failing to object to the PSR. *Id*.

The Government responds by noting, as it did above, that this claim too is "thinly veiled as an ineffective assistance claim, but is actually an attack on the PSR and the Probation Officer." Dkt. No. 16 at 46. It states that "Bah does not point to any particular section of Rule 32 that the PSR failed to comply with." *Id*. It directs the Court to Counsel's affidavit in which he states that Bah's argument that he "did not object [to the fact] that

24/42

the PSR violated Rule 32" is "broad, nonspecific[,] and [he] was not aware of any improper issue with the PSR that would give rise to a violation of Rule 32." Dkt. No. 16-1 at 4.

Indeed, Bah does not specify which of and how the PSR requirements were not met and cites no authority beyond a general Rule 32 citation in advancing this sub-claim to help clarify his argument for the Court. *See* Dkt. No. 3 at 44–46. To the extent that Bah argues that Counsel's failure to object to the PSR prejudiced him because the PSR recommended a four-level increase for a "serious bodily injury" to the victim, the undersigned has already found that a serious bodily injury existed to support the increase, making that claim meritless. *See Kimler*, 167 F.3d at 893. The only other contention Bah advances is that "[C]ounsel's failure to object to the PSR's failure to comply with Rule 32 and failure to adequately present Mr. Bah's mental health history was clearly detrimental to Mr. Bah." Dkt. No. 3 at 46. Critically, lacking further development, this argument does not suffice to prove that Counsel was deficient. *See Strickland*, 466 U.S. at 687; *United States v. Holmes*, 406 F.3d 337, 361 (5th Cir. 2005) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue." (citation omitted)). The undersigned recommends that the Court grant the Government summary judgment on this claim.

      (iii)    <u>Failure to object "to the PSR's finding that factors were present to support an upward departure/variance"</u>

Bah argues that the PSR improperly calls for an upward departure from the Guidelines sentencing range. Dkt. No. 3 at 46; *see* Dkt. No. 4 at 23–24. Count One of Bah's indictment is for bank robbery; Count Two is for use of a firearm during a crime of violence. Dkt. No. 3 at 97–100. Under Guidelines § 2B3.1(b)(2), a seven-level increase is

warranted when "a firearm was discharged" during an offense's commission. U.S.S.G. § 2B3.1(b)(2). But when, as here, the indictment lists a second count with a mandatory, consecutive minimum sentence, the enhancement is not added "to avoid unwarranted double counting." *Id*. § 3D1.1 cmt. n.2.

Bah concedes that the PSR is correct when—in line with the Guidelines—it states as follows:

> **Specific Offense Characteristics:** Pursuant to USSG § 2B3.1(b)(2)(A), if a firearm was discharged, a seven-level increase is applicable. Although Bah entered the bank and shot the victim . . . in the head, this enhancement is not applicable pursuant to USSG § 3D1.1, comment. (n.2). This instructions' [sic] main emphasis is to avoid unwarranted double counting; therefore, the offense level for Count 1 under USSG § 2B3.1 is computed without application of the enhancement for weapon possession or use as otherwise required by subsection (b)(2) of that guideline.

Dkt. No. 4 at 13–14. In other words, although Bah discharged a firearm during the commission of his robbery, the seven-level enhancement under § 2B3.1(b)(2)(A) was not included in the underlying sentence level calculation because a mandatory, consecutive sentence was already included for Count Two of Bah's indictment for use of a firearm during a crime of violence.

Bah disagrees with the PSR, though, in that it includes a section listing "factors that may warrant departure and/or variance." Dkt. No. 4 at 23–24; *see* Dkt. No. 3 at 47. In that section, the PSR states:

> Pursuant to USSG § 5K2.6, if a weapon or dangerous instrumentality was used or possessed in the commission of the offense the Court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the dangerousness of the weapon, the manner in which it was used, and the extent to which its use endangered others. The discharge of a firearm might warrant a substantial sentence increase.
>
> In committing the robbery in the instant offense, the defendant discharged his handgun and shot the victim in the head. The victim suffered

> serious bodily injury to his head and could have been killed. Additionally, after the victim was shot, the defendant pointed the handgun to another teller demanding the money be given to him. The teller also received medical treatment and may have suffered a minor heart attack or anxiety attack as a result.

Dkt. No. 4 at 23–24. "[F]or reasons unknown and unexplained in the PSR," Bah contends, "the United States Probation Office ignored the directives of [§ 3D1.1 of] the Guidelines by suggesting factors explicitly excluded from consideration in determining the offense level could somehow justify an upward departure from the offense level [under § 5K2.6]." Dkt. No. 3 at 47. Bah evidently treats the sentencing enhancement considerations under § 2B3.1 the same as a sentencing departure consideration under § 5K2.6—if improper under § 2B3.1, then improper under § 5K2.6.

The Government responds by noting again that "[t]his is another issue in which Bah attacks the PSR and the Probation Officer, couching it as an ineffective assistance claim." Dkt. No. 16 at 50. It further highlights that "courts have affirmed upward departures under § 52K.6, even in cases where [use of a firearm during a crime of violence] convictions were involved, when defendants intentionally discharged firearms at other individuals." *Id.* at 51. And critically, it notes that the Court's sentence represented a variance, not a departure from the Guidelines range. *Id.* at 52; *see United States v. Watley*, 46 F.4th 707, 718 n.7 (8th Cir. 2022) ("A departure occurs within the context of the Guidelines themselves, which prescribe that the sentencing court should depart from the Guidelines range in certain situations . . . . A variance, however, results from a separate analysis of whether a non-Guidelines sentence would be more appropriate under the circumstances pursuant to 18 U.S.C. § 3553(a)." (cleaned up)); *United States v. Jacobs*, 635 F.3d 778, 781–82 (5th Cir. 2011) (per curiam) (describing

the differences between departures and variances and noting that the two "are not one and the same").

The Court need only address the Government's latter point because it is dispositive. Bah's sub-claim fails in part because he cannot prove that he was prejudiced by the Court's application of the Guidelines' departure sections, as the Court did not depart from the Guidelines range to impose its sentence—rather, it varied from it. CR Dkt. No. 73 at 2–3; *cf. Watley*, 46 F.4th at 718 n.7; *Jacobs*, 635 F.3d at 781–82. In other words, Bah was not prejudiced by the PSR's (proper or improper) inclusion of information relative to departures when the Court did not depart from Bah's sentence.[9]

In a final argument, Bah asserts that Counsel was ineffective by failing to object to the PSR's "improper use of subjective and emotionally charged language" used to "justify its position that factors were present to warrant an upward departure." Dkt. No. 3 at 48–49. Bah opposes the PSR's statement that the first bank teller was "shot in the head," that the teller suffered "serious bodily injury," and that the teller "could have been killed." *Id.* at 48–50. He also rejects the PSR's assertion that the second teller "may have suffered a minor heart attack or anxiety attack" when Bah pointed a gun at him." *Id.* However, again, the Court did not depart from Bah's Guidelines range, it varied from it. Further, even before the Probation Office prepared the PSR, Bah agreed with the Government's factual summary of his offense stating, among other things, that he shot one teller "in the head" and "assaulted and put in jeopardy the life of a person by the use of a dangerous weapon, a firearm." *See* Dkt. No. 3 at 91; CR Dkt. No. 49. Bah pleaded guilty to those offenses. Dkt.

---

[9] On direct appeal, Bah "challeng[ed] the sufficiency of the district court's reasoning in" varying upward and "imposing [a sentence of] 300 months and life in prison, respectively." *United States v. Bah*, No. 21-40712, 2023 WL 2239021, at *1 (5th Cir. Feb. 24, 2023) (per curiam). As noted, the Fifth Circuit affirmed Bah's sentence. *Id.* at 1–4.

No. 3 at 89. Counsel, then, was not ineffective for failing to object to the information in the PSR to which Bah previously admitted. *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."). Even assuming without finding deficient performance for failure to object to the PSR's inclusion of the opposed information, the information was provided to the Court elsewhere in the record.[10] Thus, the Court cannot find that but for Counsel's failure to object to the information in the PSR, Bah's sentence would be different. *See Strickland*, 466 U.S. at 694.

The undersigned recommends that the Court grant the Government summary judgment on this claim.

> (iv)  Counsel "should not have . . . advocated against Mr. Bah by recommending an upward departure/variance of at least five years"

Bah next claims that Counsel was ineffective "by recommending an upward departure/variance of at least five years." Dkt. No. 3 at 50. "While the Guidelines provided an advisory range of 171 months to 183 months imprisonment," Bah continues, "[C]ounsel inexplicably argued for a sentence of 243 months, thus adding five years to the high-end of the advisory Guideline range and over six years to the low-end of the advisory Guideline range." *Id*. The Government contends that Counsel "was pursuing an advisable trial strategy given the egregious facts of Bah's offense, which were highly likely to lead to an upward departure or variance." Dkt. No. 16 at 53. That is, with a "variance or departure [being] highly likely," it was sound strategy to recommend a sentence of 283 months'

---

[10] In affirming the Court's sentence variance in Bah's direct appeal, the Fifth Circuit cited as a reason for its conclusion the Court's "intimate[] familiar[ity] with the harrowing facts of the case[.]" *Bah*, 2023 WL 2239021, at *4. Those facts include "Bah's admission of guilt," Bah's decision not to allocute, and details contained in victim impact statements. *Id*.

imprisonment in the face of the Government's request for 600 months' imprisonment. *Id.* at 53–54.

"Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (cleaned up).

At the September 22, 2021 sentencing hearing, the Government informed the Court that: (1) Bah's Guidelines range on Count One was fifty-one to sixty-three months' imprisonment; (2) a consecutive, minimum ten-year sentence was mandatory on Count Two, making the effective Guidelines range 171–183 months' imprisonment for both counts; (3) Count One has a statutory maximum sentence of twenty-five years' imprisonment, and Count Two a maximum sentence of life imprisonment; (4) the Government sought an upward departure and variance, as per its notice and intent filed August 27, 2021, of twenty-five years' incarceration on both counts to run consecutively, because the Guidelines "punishment range at the high end . . . grossly underrepresents the facts of this crime and the dangerousness of Mr. Bah"—including the fact that Bah shot one bank teller within five seconds of approaching him; and (5) the victims of Bah's crime continue to suffer from emotional trauma. CR Dkt. No. 80 at 5–17. The Court also possessed the PSR detailing, among other things, Bah's robbery and mental health

history; Bah's competency evaluation; and surveillance video of Bah's robbery—including his shooting the bank teller. Dkt. No. 4; CR Dkt. Nos. 65, 80 at 11.

With that information before the Court, Counsel replied, noting that: (1) other than a misdemeanor offense five years prior, Bah had no criminal record beyond traffic violations; (2) while Bah fired his weapon, he only did so once, sparing the remaining individuals at the bank; (3) Bah did not resist arrest when he was ultimately apprehended; (4) "a root to Mr. Bah's conduct is that . . . it strongly appears that Mr. Bah suffers from some type of psychological disorder," indeed, "the PSR clearly reflects that . . . Mr. Bah was committed into a mental institution back in North Carolina"; (5) Dr. Gonzalez "did not find any evidence of schizophrenia," but Bah's conduct during his legal proceedings was erratic and "consistent of somebody" with a disorder—hiring and firing his attorneys and waffling on whether to represent himself pro se multiple times; and (6) that Counsel spoke with Bah "quite a bit . . . and there's . . . something wrong." CR Dkt. No. 80 at 17–21. Counsel then asked the Court to consider sixty-three months' imprisonment on Count One and 180 months' imprisonment on Count Two, for a total of 243 months' imprisonment, and stated that he believed that sentence "serves to punish Mr. Bah for what he's done but also takes into consideration the mitigating factors . . . that I'm hoping the court will . . . consider with respect to what happened that day and then the conditions that . . . Mr. Bah suffers from." *Id.* at 20–21. The Court then varied upward past Counsel's and the Government's recommendations and sentenced Bah to consecutive terms of twenty-five years' and life imprisonment. Dkt. No. 3 at 135–36.

The Court further finds Bah has not overcome the presumption that Counsel's conduct might have been sound strategy. *Strickland*, 466 U.S. at 689. For one thing, Bah does not address that possibility. *See* Dkt. No. 3 at 50–52. Rather, Bah contends that

Counsel "inexplicably" recommended a sentence of 243 months' imprisonment in violation of the ABA's Standards for Criminal Justice: Prosecution and Defense Function, and that prejudice followed. *Id.* at 50, 56; *see* ABA, *Criminal Justice Standards for the Defense Function*, § 4-1.2(b), (d) (4th ed. 2017) (concerning counsel's duties to "render effective, high-quality legal representation with integrity" and to "act zealously within the bounds of the law and standards on behalf of their clients"). Neither does Bah supply the Court with relevant authority holding that recommending a sentence above the Guidelines range but well below the Government's recommended sentence represents per se deficient performance. Instead, Counsel very well might have been confident that the Court would vary significantly from the Guidelines range, particularly if he requested a within-Guidelines sentence, given the grim details of the case. *See Bah*, 2023 WL 2239021, at *4. Stated otherwise, as the Government does, Counsel could have been "keenly aware that a significant variance or departure was highly likely, and seemed to be attempting to account for that while undercutting the Government's recommendation by more than 25 years." Dkt. No. 16 at 54.

In the end, even assuming without finding that Counsel provided deficient performance, Bah cannot prove prejudice because the Court did not sentence Bah to a within-Guidelines range, 243 months' imprisonment as recommended by Counsel, or 600 months' imprisonment as per the Government's request, but instead life plus twenty-five years' imprisonment. Dkt. No. 3 at 135–36. There is no indication in the record that Bah's sentence would have been shorter had Counsel requested a sentence within the Guidelines range.

Bah has failed to show that Counsel provided ineffective assistance. Thus, the Government's summary judgment on this claim should be granted.

(v)    Failure to dispute the Government's "mischaracterization of Mr. Bah's only prior conviction"

The PSR asserts that Bah was once convicted for a crime. Dkt. No. 3 at 52−53; *see* Dkt. No. 4 at 15. The misdemeanor in question is a 2016 arrest and conviction in North Carolina for assault of a government employee, resulting in a sixty-day jail sentence, which, according to the PSR, the North Carolina state court suspended and then placed Bah on a term of twelve months' probation. Dkt. No. 4 at 15. By his final sub-claim, Bah argues that Counsel was ineffective for failing to object at the sentencing hearing to the Government's claim that the same conviction was for a crime "of violence," which Bah asserts contributed to the Court's "upward departure." Dkt. No. 3 at 54.

Among other things, the Government argues that Bah's "attempt[] to characterize the Government's brief comment as critical to the argument for an upward variance . . . is not supported by the record." Dkt. No. 16 at 58. "The focus of the Government's argument for an upward departure or variance was the egregious nature and circumstances of the offense, particularly injuries and impact on the victims." *Id.* The Government highlights that the alleged improper comment "was a single sentence in the ten pages of [its] argument for an upward departure or variance." *Id.*

The parties amply assess whether Bah's assault conviction was a crime of violence under North Carolina law. Dkt. Nos. 3 at 52−55, 16 at 56−59. But the Court need not analyze North Carolina law here because, even assuming without finding that Counsel's performance was deficient by failing to object to the PSR and at the sentencing hearing regarding the Government's mention of Bah's 2016 misdemeanor conviction as being one for a "crime of violence," Bah has not met his burden to prove that his sentence would be different but for the deficient representation. *See Strickland*, 466 U.S. at 697 ("If it is

easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). When it sentenced Bah, the Court was "intimately familiar with the harrowing facts of the case." *Bah*, 2023 WL 2239021, at *4. Those facts include "Bah's admission of guilt," Bah's decision not to allocute, details contained in victim impact statements, and surveillance video of the robbery. *Id.* The Government reiterated those details at the September 22, 2021 sentencing hearing. CR Dkt. No. 80 at 5–17. There is nothing in the record supporting the contention that the Government's brief "crime of violence" statement had any impact on the Court's sentence. So Bah has not established that counsel's alleged deficient performance prejudiced him, and his claim fails.

The undersigned recommends that the Court grant the Government summary judgment on this claim.[11]

### (3)    Failure to Present All Formal Plea Agreements

Bah's final ineffective assistance of counsel claim concerns Counsel's alleged failure to present all plea offers to him. "[T]he Sixth Amendment right to effective assistance of counsel extends to plea negotiations." *Miller v. Thaler*, 714 F.3d 897, 902 (5th Cir. 2013) (citing *Frye*, 566 U.S. at 144). "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 566 U.S. at 145. The *Strickland* standard also applies to claims that counsel's deficient performance caused a plea offer to lapse or be rejected. *Id.*; *see also United States v. White*, 715 F. App'x. 436, 437 (5th Cir.

---

[11] Bah concludes this section of his argument by asserting that Counsel's deficiencies, considered in the aggregate, prejudiced Bah. Dkt. No. 3 at 56–59. But as noted, four of Counsel's alleged failures did not constitute deficient performance, and the one remaining of Counsel's actions, even assuming deficient performance, did not prejudice Bah.

2018) (per curiam). When counsel's performance is deficient by failing to communicate formal plea offers to the defendant, to prove *Strickland*'s prejudice prong, the defendant must demonstrate a reasonable probability that:

> (1) he would have accepted the plea offer had he been afforded effective assistance of counsel; (2) the plea would have been entered without the prosecution canceling the offer or the trial court's refusing to accept it; and (3) the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.

*King v. Davis*, 898 F.3d 600, 605 (5th Cir. 2018).

Bah's final claim stems from the following exchange at his June 28, 2021 re-arraignment hearing:

| THE COURT: | And, [Counsel], have all formal plea offers by the government been conveyed to your client? |
|---|---|
| [Counsel]: | They have, Your Honor. |
| THE COURT: | All right. |
| [Counsel]: | And we, for the record, we've rejected them. |
| THE COURT: | Thank you, sir. |

Dkt. No. 3 at 82. Bah asserts that contrary to Counsel's statement, Counsel never informed Bah of any plea agreements. *Id.* at 60, 440–41 (Bah's "Unsworn Declaration Under Penalty of Perjury").

The Government responds that Bah's claim "is unsupported by the record and meritless." Dkt. No. 16 at 36. Attached to its motion for summary judgment is an affidavit by Counsel stating, among other things, that:

> On March 31, 2021, [Counsel] went to the jail to review plea papers and the initial plea deal offered by the Government which was to plea guilty to both counts and [Bah] would receive acceptance points and a recommendation of low end. At this point, Mr. Bah refused to enter a plea deal.
>
> On April 13, 2021, [Counsel] was able to arrange with the prosecutor, a "show and tell" for the purpose of trying to convince Mr. Bah to plea guilty

> pursuant to a plea deal. Mr. Bah was shown pictures of all the evidence . . . .
> Mr. Bah did not want to plea guilty and did not want to entertain a plea deal
> and refused to sign the plea papers.

Dkt. No. 16-1 at 3.

Given Bah's and Counsel's conflicting statements, the Court held an evidentiary hearing on August 2, 2024, to determine whether the Government extended any plea offers to Bah and, if so, whether Counsel informed Bah of the offers. Dkt. No. 46; *see United States v. Rivas-Lopez*, 678 F.3d 353, 358 (5th Cir. 2012) ("A district court must hold an evidentiary hearing 'unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" (quoting 28 U.S.C. § 2255(b) (brackets omitted))); *see also United States v. Lopez*, 825 F. App'x. 196, 199 (5th Cir. 2020) (holding that dispute between defendant and counsel as to whether counsel advised defendant that rejecting a plea offer could lead to a much longer sentence at trial "is precisely the sort of factual dispute that requires an evidentiary hearing"); *cf. United States v. Giacomel*, 153 F.3d 257, 258 (5th Cir. 1998) (stating that a Magistrate Judge may make credibility findings based on evidence presented at an evidentiary hearing in a 28 U.S.C. § 2255 case).

Testifying at the evidentiary hearing were Bah, Counsel, and David. A. Lindenmuth—the Assistant United States Attorney who prosecuted Bah's case. Dkt. No. 46 at 2. Before testimony opened, the Government offered, without objection, six exhibits. *Id.* at 5; Dkt. Nos. 43–43-6. Among the exhibits were two "plea packet memo[s]." Dkt. Nos. 43-1 ("Government Exhibit 1"), 43-2 ("Government Exhibit 2"). The Court admitted all six exhibits. Dkt. No. 46 at 5.

Bah's habeas counsel called Bah to the stand. *Id.* at 7. Bah testified that the Court appointed Counsel to represent him in his criminal case, and Counsel met with him to

discuss his case. *Id.* at 7–8. When asked whether Counsel presented any plea offers to him, Bah responded, "No." *Id.* at 8. When asked whether he would have accepted a plea offer for a recommendation of the low end of the Guidelines sentence range and acceptance of responsibility points, Bah responded, "Yes." *Id.*

On cross-examination by the Government, Bah agreed that Counsel visited him in jail "on many occasions." *Id.* at 9. He confirmed that he had a "show-and-tell" with Counsel and the Government where he saw the evidence against him, but he denied that Counsel or the Government "mentioned anything about a plea offer." *Id.* at 9–10. Later in Bah's testimony—after he and the Government discussed his waffling on whether to have Counsel represent him at trial—the Government asked Bah whether the first time he told Counsel that he was willing to plead guilty was just before his June 28, 2021 re-arraignment hearing. *Id.* at 12. Bah responded: "No, I told [Counsel] when he came to visit me at [the detention center] the first time to discuss the plea offer. That was before the first Arraignment Hearing." *Id.* at 12–13. According to Bah, at some unspecified date, he informed Counsel that he would plead guilty, and Counsel asked Bah "to sign a paper." *Id.* at 13. The paper's substance represented the "same open plea . . . that [Bah] ended up signing later on." *Id.*

Next, the Government called Counsel to the stand. *Id.* at 14. Counsel testified that he met with Bah on March 31, 2021, to present Bah with a "set of plea papers" containing a recommendation "that [Bah] would get acceptance for responsibility and a recommendation of low end on both counts of the Indictment." *Id.* at 18. The Government asked Counsel whether he was familiar with Government Exhibit 1, the first plea agreement extended to Bah, and whether it was the offer Counsel presented to Bah on March 31, 2021. *Id.* at 18–19. To both questions, Counsel answered affirmatively. *Id.* at

18–20. Counsel testified that in response to the Government's plea offer, Bah "was very hesitant, declined to sign it, [and] said he did not want to enter a plea." *Id.* at 20. Thereafter, Counsel and the Government set up a show and tell at the United States Attorney's Office in Brownsville at which "Bah was shown the evidence that the Government had." *Id.* at 20–21. Counsel did not recall whether any plea offers were discussed at the show and tell; instead, he believed the purpose of the show and tell was for Bah to "understand that . . . he doesn't want to go to trial because this is the evidence the Government has." *Id.* at 21–22.

The Government then asked Counsel if "at any other point in time" he "discuss[ed] plea offers from the Government" with Bah. *Id.* at 22. Counsel responded affirmatively and began describing a series of events following the show and tell on April 13, 2021, to around June 25, 2021. *Id.* at 22. On April 20, 2021, Counsel met with Bah, and Bah informed Counsel that "he wanted to fire [Counsel] at that point and go back to representing himself." *Id.* at 22–23. Counsel immediately moved for a hearing on the matter, and the hearing transpired the following day. *Id.* at 23. At the hearing, the Court "authorized" Bah to proceed pro se, appointed Counsel as standby counsel again, and set the trial date for June 28, 2021. *Id.* at 23. Counsel testified that shortly before June 28, he spoke with Bah via telephone, at which point "[Bah] said he did not want to go to trial, that he wanted to plead guilty, and he wanted [Counsel] to represent him to get him to the plea." *Id.* at 24–25. According to Counsel, that was the first time that Bah confirmed that he desired to plead guilty. *Id.* at 25. Counsel "notified Mr. Lindenmuth . . . of what transpired" and acquired "a second set of plea papers." *Id.* In exchange for Bah's guilty plea, waiver of certain appellate rights, and forfeiture of firearms, those plea papers recommended only a two-point sentence reduction for acceptance of responsibility. *Id.*

Counsel advised Bah not to accept that offer because Bah was getting nothing in return for his waiver of appellate rights; Bah declined to sign the offer—but he did sign "the Factual Summary [Sheet]" describing the offer. *Id.* Counsel confirmed that Government Exhibit 2 is the relevant "Factual Summary [Sheet]" that he, Lindenmuth, and Bah each signed. *Id.* at 26. Counsel testified that he had asked Lindenmuth if Bah could plead to only one count, but Lindenmuth informed him that "the offense [wa]s too egregious" for him "to agree to dropping either of the counts." *Id.* at 27. The Government concluded its direct examination of Counsel by asking whether his statement at the June 28, 2021 sentencing hearing that he and Bah had rejected all formal plea offers meshes with his testimony at the evidentiary hearing. *Id.* at 29. Counsel responded:

> Yes, sir. I had shown [Bah] the first set of plea papers that had an offer of acceptance and a low end, and he had rejected that. And then the second offer, which was of the June 28, was just two points and waive his appellate rights. And I advised him that he did not want to waive his appellate rights, so we rejected that offer, too.

*Id.*

Last to the witness stand was Lindenmuth. *Id.* at 35. He testified that he prosecuted Bah's case, and that he extended two plea agreements to Bah. *Id.* at 35–36. He stated that he likely sent the first agreement to Bah "close in time to [Bah's] arrest." *Id.* at 36. In response to the Government's questioning, Lindenmuth affirmed that there came a time after he made the first plea offer that he reconsidered it. *Id.* He testified that he rescinded the first plea offer after recognizing that the low end of the estimated Guidelines range for Bah's crimes "was grossly insufficient for the behavior that [he] had charged" Bah with. *Id.* at 37–38. Thereafter, Lindenmuth "superseded" the first offer with the Government's second plea offer and stated that he would not have then moved forward with the first plea offer even if Bah agreed to it. *Id.* at 38–39. Lindenmuth confirmed that Government

Exhibits 1 and 2 represent the two plea offers he extended to Bah. *Id.* at 38–39. The Government asked Lindenmuth whether he discussed a plea offer at the April 12, 2021 show and tell. *Id.* at 40–41. Lindenmuth responded, "Absolutely," and claimed that in "every single show-and-tell" that he has ever conducted, he addressed plea offers. *Id.* at 41. On cross-examination, Lindenmuth admitted that he did not recall when exactly he withdrew the first plea offer or which plea offer was discussed at the show and tell. *Id.* at 45–47.

This record demonstrates that Counsel did not render ineffective assistance. *See Frye*, 566 U.S. at 145; *King*, 898 F.3d at 605. Both Counsel and Lindenmuth testified in detail that the Government extended two plea offers to Bah, and that Counsel informed Bah of the offers. Dkt. No. 46 at 29, 35–36. The Court admitted without objection Government Exhibits 1 and 2, which both Counsel and Lindenmuth testified accurately represented the two offers presented to Bah. Further, Bah testified inconsistently. He originally asserted via affidavit and later testified during the evidentiary hearing that nobody ever presented him with a plea offer. During the hearing, he further testified that Counsel "came to visit [him] . . . to discuss the plea offer," and that Counsel asked him to "sign a paper" which had the "same open plea . . . that [Bah] ended up signing later on." Dkt. No. 46 at 12–13. In other words, by Bah's own admission (and, indeed, Bah's signature on the Factual Summary Sheet containing one of the two plea offers), Counsel presented at least one plea offer to him. Evidence elsewhere in the record supports a finding that Bah was informed of the two plea offers presented to Counsel—most notably the fact that Bah did not object to Counsel's statement at his June 28, 2021 re-arraignment hearing that all plea offers were presented to and rejected by Bah. *See generally* Dkt. No. 3 at 82.

For these reasons, after considering all the evidence in this case, the undersigned finds that both plea offers were extended to and rejected by Bah. And because that ends the inquiry,[12] Bah's claim should be dismissed.

## V.    CERTIFICATE OF APPEALABILITY

Rule 11 of the Rules Governing § 2255 Proceedings states that a district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability shall not issue unless the movant makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requires a "showing that reasonable jurists could debate whether (or, for that matter, agree that) the [motion] should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (cleaned up). Where claims have been dismissed on the merits, the movant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id*. District courts may deny certificates of appealability sua sponte, without requiring further briefing or argument. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (per curiam).

A certificate of appealability should not issue in this case because a reasonable jurist would not find the Court's assessment of Bah's constitutional claims debatable or wrong.

---

[12] Finding that Bah failed to prove the deficient performance *Strickland* prong on this claim, the Court need not assess the prejudice prong. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995).

## VI.    RECOMMENDATION

For the foregoing reasons, it is recommended that the Court: (1) **GRANT** the Government's Motion for Summary Judgment on Bah's first and second claims; (2) **DISMISS** all three of Bah's claims; (3) **DECLINE** to issue a certificate of appealability; and (4) **DIRECT** the Clerk of Court to close this case.

## VII.    NOTICE TO PARTIES

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996).

**SIGNED** on this **26th** day of **August, 2024**, at Brownsville, Texas.

_____
**Ignacio Torteya, III**
**United States Magistrate Judge**